UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DAVID ISMAN, on behalf of himself and all others similarly situated, | CASE NO. _____ |
| Plaintiff, | <u>JURY TRIAL DEMANDED</u> |
| v. | |
| AMEDISYS, INC, WILLIAM F. BORNE, and DALE E. REDMAN, | |
| Defendants. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff, David Isman, by his attorneys, on behalf of himself and all others similarly situated, alleges the following based upon the investigation of plaintiff's counsel, except as to allegations specifically pertaining to plaintiff, which are based on personal knowledge. The investigation of counsel included, among other things, a review of Amedisys, Inc. ("Amedisys" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, public conference calls, media and news reports about the Company, and publicly available trading data relating to the price and volume of Amedisys common stock.

## I.   <u>INTRODUCTION</u>

1.      This is a federal class action brought on behalf of a class consisting of all persons who purchased the publicly traded common stock of Amedisys between April 30, 2008 and June 30, 2010, inclusive (the "Class Period').

2.     This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC by plaintiff on behalf of all those who purchased the publicly traded common stock of Amedisys during the Class Period to recover damages caused to the Class by defendants' violations of the securities laws.

3.     Amedisys describes itself as a leading provider of high-quality, low-cost home health services to the chronic, co-morbid, aging American population. According to the Company's Annual Report for the year ended December 31, 2009 filed with the SEC on Form 10-K on February 23, 2010, as of December 31, 2009, Amedisys owned and operated 521 Medicare-certified home health agencies and 65 Medicare-certified hospice agencies in 40 states within the United States, the District of Columbia and Puerto Rico.

4.     Throughout the Class Period, defendants reported "record" financial results.  But defendants failed to disclose (1) that the Company improperly increased the number of in-home therapy visits to patients for the purpose of triggering higher reimbursement rates under the Medicare home health prospective payment system; (2) as a result of the Company's improper conduct, its reported sales and earnings were materially inflated; (3) and based on the foregoing, defendants lacked a basis for their positive statements about the Company, its prospects and growth.

5.     On April 26, 2010, *The Wall Street Journal* ("WSJ") online reported that an analysis by the WSJ of Medicare payments to home health-care companies in recent years raised "questions about whether some companies-including the sector's largest, Amedisys, Inc. are taking advantage of the Medicare reimbursement system. The

results show that the number of in-home therapy visits tracks Medicare financial

incentives." (the "April 26 WSJ Article").

6.    The April 26, 2010 WSJ article further stated, in part, the following:

Founded in 1982 by William Borne, a 52-year old registered nurse, Amedisys derives 90% of its revenue from Medicare reimbursements. As Medicare spending on home health surged over the past decade, the company has seen its sales skyrocket with revenue of $1.5 billion last year, up from $88 million in 2000. Among health-care stocks, Amedisys has been a star, soaring to $60 a share yesterday from less than $1 in 2000.

Medicare reimbursements are determined in part by the number of at-home therapy visits each patient receives, with an extra fee kicking in as soon as a patient hits a certain number of visits. Between 2000 and 2007, Medicare paid companies a flat fee of about $2,200 for up to nine home therapy visits. It paid an additional reimbursement of roughly $2,200 if the therapy surpassed nine visits. That incentive was designed so that agencies didn't "stint" on therapy visits, says Laurence Wilson, the director of chronic-care policy group at the Centers for Medicare and Medicaid Services, the agency that runs Medicare.

According to The Journal analysis, which was based on publicly available Medicare records, Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more. In 2007, for instance, only 2.88% of patients got nine visits, while 9.53% of patients got 10 visits.

"I was told 'we have to have ten visits to get paid,'" says Tracy Trusler, a former Amedisys nurse for two years in Tennessee, who has since left the company. Her supervisors, she says, asked her to look through patients' files to find those who were just shy of the 10-visit mark and call their assigned therapists to remind them to make the extra appointment.

"The tenth visit was not always medically necessary," Ms. Trusler says.

Kevin LeBlanc, a spokesman for Amedisys, says the company didn't take advantage of the system and that the company's home visits "are in line with the industry trends."

He said Amedisys in general focuses on sicker patients than the industry average, and therefore patients that require more care. "Amedisys' clinical patterns are representative of the patient population we focus on,

namely those patients suffering from complex, chronic and co-morbid medical issues," he said.

The number of visits eligible for the extra reimbursement has a significant impact on home-health providers' receipts from Medicare and thus on overall revenue. While Amedisys doesn't break out the amount of revenue from the extra Medicare payment, the company says between 55% and 60% of its patients receive home therapy. In 2007, according The Journal's analysis, 28.5% of the patients who received therapy got 10 to 12 visits, thereby triggering the extra $2,200 Medicare payment. Such cases are highly profitable because they cost the company less than $80 per visit.

Medicare reimbursements for the entire home health-care industry are coming under increased scrutiny. The federal agency that advises Congress on Medicare payment issues, the Medicare Payment Advisory Commission, or MedPAC, warned last month that home health "overpayments contribute to the insolvency" of the Medicare trust fund as well as premium increases that beneficiaries must pay.

Medicare changed its reimbursement rules in January 2008 in an attempt to blunt the incentive for home health-care visits it created. It eliminated the $2,200 bonus payment at 10 visits and now pays an extra fee of a couple of hundred dollars at six, 14 and 20 therapy visits. "What we felt we could do is try to create some better incentives in the system for providing the level of service that beneficiaries actually needed," says Mr. Wilson from Medicare.

It wasn't until the change was made that MedPAC noticed the questionable home visit patterns. In its March report, the agency said that the industry-wide percentage of therapy visits in the 10-to-13 range dropped by about a third after the policy change in 2008.

The pattern of clustered visits around reimbursement targets is continuing: MedPAC found the number of therapy visits numbering six, 14 and 20 increased after the policy was changed in 2008.

During a MedPAC meeting in December, Arnold Milstein, a MedPAC commissioner, questioned whether all the home visits were appropriate. "Looking at the great speed with which the volume of services adapts to payment changes, which are breathtaking, it does suggest that there may be a problem with certifying the appropriateness of these services," Mr. Milstein said, according to a transcript of the meeting.

Based on the report, MedPAC suggested for the first time last month that

the Secretary of Health and Human Services "review home health agencies that exhibit unusual patterns of claims for payment."

The Journal analysis found a similar pattern: In 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that got six visits increased 8%. The percentage of patients getting 14 visits rose 33% and the percentage getting 20 visits increased 41%.

The Amedisys spokesman said any suggestion the company may have increased its number of therapy visits to receive higher reimbursements is "both incendiary and inaccurate."

Amedisys provided its own analysis of the 2007 Medicare data that came out very close to The Journal's, but said the results don't suggest a drive to reach 10 visits. Amedisys says its analysis showed its proportion of visits numbering 13 or more-for which there was no financial incentive-was higher than the rest of the industry, showing that it provided the visits people needed without regard to the reimbursement.

Amedisys provided 37% of its patients with 13 or more visits in 2007, compared with 31% of patients who got 13 or more visits in the rest of the industry, according to The Wall Street Journal analysis . . . .

In 2000, Medicare rolled out its new reimbursement system. It began paying a flat sum of about $2,200 for a 60-day period of care, no matter how many times a nurse went to a patient's home. The fee also included up to nine visits from occupational, physical or speech therapists. Doctors need to sign off on the number of visits in order for the company to be reimbursed.

Through 2007, an agency would receive the additional $2,200 if it sent a therapist to a patient's home 10 or more times during the same period.

The generous Medicare reimbursements are one reason the home health-care industry has grown so swiftly, according to MedPAC. There are now more than 10,400 home-health agencies in the U.S., up nearly 50% since 2002.

After the new reimbursement system was implemented in 2000, Amedisys's fortunes improved markedly. Its profits rose and its stock soared. Today, Amedisys has a market value of $1.7 billion.

Mr. LeBlanc said many factors contributed to Amedisys's rapid growth, including "our significant investment in the best and most innovative technologies, our strategic acquisitions of compatible companies, our

expansion into other therapies and by providing the best quality care for our patients at a lower cost." He emphasized that the number of home therapy visits is driven not by the company but by doctors orders. "The final decision as to how much care the patient needs ultimately is authorized by the physician, not the home health-care provider," he said in an email.

However, doctors aren't required to see a patient in person to recommend them for home health-care or examine their progress. Some rely on home therapists to provide guidance on the number of visits a patient requires.

"Generally, I leave it up to the therapist because that's what they're best at," said Jeff Esslinger, an internal medicine doctor in Cartersville, Ga., who is one of Amedisys ' medical directors. Typically, a therapist will visit and evaluate a patient at home, recommending how many weeks of therapy the patient will need, Mr. Esslinger said. "It's pretty rare for me to disapprove of what they do."

To conduct its analysis, The Journal enlisted Henry Dove, a professor at Yale University's School of Public Health and an expert in analyzing Medicare data. Mr. Dove mined Medicare's database to determine how often between 2005 and 2008 various home-health companies sent therapists to patients' homes during a 60-day period of care, and whether the number of visits coincided with Medicare financial incentives.

7.     On April 27, 2010, Amedisys stock declined $3.98 per share or 6.5% on heavier than usual volume, to close at $56.52 per share.

8.     On May 13, 2010, the WSJ reported that the United States Senate Finance Committee ("Senate Finance Committee" or "Committee") had started an investigation into the billing and operating practices of Amedisys.  In a Committee letter dated May 12, 2010 to Amedisys, the Committee referenced the April 26 WSJ Article and requested the Company to produce documents dating as far back as 2006, concerning data on therapy visits, lists of physicians with the highest patient referrals to the Company, and copies of all marketing materials.

9.     After these disclosures, Amedisys stock declined 8% or $4.48 per share on heavier than usual volume, to close at $51.76 per share.

10. Then, on June 30, 2010, after the close of trading, Amedisys issued a press release that disclosed the Company was under formal investigation by the SEC for the conduct described in the April 26 WSJ Article:

> BATON ROUGE, La.--(BUSINESS WIRE)--Amedisys, Inc. (NASDAQ: AMED - News), one of America's leading home health and hospice companies, today announced that it has received notice of a formal investigation from the Securities and Exchange Commission (SEC) pertaining to the company, and received a subpoena for documents relating to the matters under review by the Senate Finance Committee. Amedisys intends to cooperate with the SEC with respect to this investigation . . . .

11. On July 1, 2010, Amedisys shares declined from a close on June 30, 2010 of $43.98 per share, to close at $39.34 per share, a decline of $4.64 per share or approximately 11%, on higher than usual volume.

## II.    JURISDICTION AND VENUE

12. The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Jurisdiction is conferred by Section 27 of the Exchange Act. Venue is proper pursuant to Section 27 of Exchange Act as defendant Amedisys and/or the Individual Defendants conduct business in and the wrongful conduct took place in this District.

## III.    THE PARTIES

13. Plaintiff purchased Amedisys' publicly traded common stock as detailed in the attached Certification and was damaged thereby.

14. Defendant Amedisys is incorporated in Delaware and its principal executive offices are located 5959 South Sherwood Forest Boulevard, Baton Rouge, LA 70816. The aggregate number of shares of Amedisys common stock outstanding as

of April 22, 2010 is approximately 28.6 million shares. Amedisys is actively traded on the NASDAQ under the ticker symbol "AMED."

15.     Defendant William F. Borne ("Borne") was the founder of the Company and has been the Company's Chief Executive Officer and Chairman of the Board of Directors since 1982. During the Class Period, Defendant Borne signed the Company's annual reports filed with the SEC and signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). During the Class Period, Borne sold 148,347 shares (approximately 47% of his Amedisys stock) for proceeds of approximately $8 million.

16.     Defendant Dale E. Redman ("Redman") has been the Company's Chief Financial Officer since February 2007. During the Class Period, Defendant Redman signed the Company's quarterly and annual reports filed with the SEC and signed SOX certifications. During the Class Period, Redman sold 1,965 shares (approximately 10% of his Amedisys stock) for proceed of over $111,343.

17.     The individuals named as defendants in ¶¶ 15-16 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Amedisys's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to

and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV. CLASS ACTION ALLEGATIONS

18. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons who purchased the publicly traded common stock of Amedisys during the quarter from April 30, 2008 through June 30, 2010, inclusive (the "Class").

19. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at the present time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members of the Class located throughout the United States. Throughout the Class Period, Amedisys had over 28.6 million shares of common stock outstanding, which were actively traded on the Nasdaq in an efficient market.

20. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have sustained damages because of defendants' unlawful activities alleged herein. Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by plaintiff. Plaintiff has no interests which are contrary to or in conflict with those of the Class that plaintiff seeks to represent.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)     whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)     whether defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and the proper measure of such damages.

## V.     FALSE AND MISLEADING STATEMENTS

23.     The Class Period begins on April 30, 2008, when the Company issued a press release announcing its financial results for the quarter ended March 31, 2008 ("April 30, 2008 Press Release"), which stated, in part, the following:

> BATON ROUGE, Louisiana (April 30, 2008) – Amedisys, Inc. (NASDAQ: "AMED", "Amedisys" or "the Company"), one of America's leading home health nursing companies, today reported its financial results for the first quarter ended March 31, 2008. The Company posted record financial performance for the quarter with net service revenue and net income increasing 38.7% and 24.1%, respectively, over the first quarter of 2007. Following are highlights of the Company's first quarter performance:

Three-Month Periods Ended March 31, 2008 and 2007
• Net service revenue for the first quarter of 2008 increased 38.7% to $213.1 million compared to $153.6 million in 2007.
• Net income increased 24.1% to $16.5 million compared to $13.3 million in 2007.
• Diluted earnings per share increased 21.6% to $0.62 compared to $0.51 per diluted share in 2007. The weighted average number of diluted shares outstanding increased to approximately 26.6 million compared to 26.0 million in 2007.
• Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 37.0% to $32.3 million compared to $23.6 million in 2007.

"We are very pleased with our first quarter operations," stated Bill Borne, Chief Executive Officer of Amedisys. "In addition to an excellent quarter financially where we reported record revenue and strong EPS, we completed the acquisition of TLC, which we believe will be an outstanding investment for the company. With the integration of this milestone acquisition well underway, we will continue to focus on the execution of our long-term strategy of growing the business both internally and externally, and delivering high quality, cost-effective care to the patients entrusted to our service."

24. Also on April 30, 2008, Amedisys filed its quarterly report with the SEC on Form 10-Q for the quarter ended March 31, 2008 (the "Q1 2008 10-Q"). The Q1 2008 10-Q, signed by defendant Redman, repeated the Company's financial results set forth in the April 30, 2008 Press Release. The Q1 2008 10-Q contained SOX certifications that were signed by Borne and Redman that certified to the following:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, of Amedisys, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects

the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in
Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

25.     Further, the Q1 2008 10-Q stated, in part, the following with respect to how the

Company earned revenue from home health services:

*Home Health Revenue Recognition . . . .*

   *Medicare Revenue*

We primarily earn our net service revenue for home health services from Medicare . . .

Net service revenue is recorded under the Medicare reimbursement program (PPS) based on a 60-day episode reimbursement rate that is subject to adjustment based on certain variables including, but not limited, to: . . . . (d) a payment adjustment based upon the level of therapy services required (thresholds set at 6, 14 and 20 visits) . . . .

26.     On July 17, 2008, Amedisys issued a press release that stated, in part, the

following:

### AMEDISYS INCREASES 2008 REVENUE AND EPS GUIDANCE

BATON ROUGE, Louisiana (July 17, 2008)—Amedisys, Inc. (Nasdaq: "AMED", "the Company"), one of America's leading home health nursing companies, today increased its revenue and earnings per share guidance for 2008.

Net service revenue is anticipated to be in the range of $1.10 billion to $1.15 billion, including the anticipated impact of our recent acquisitions, but excluding the impact of any future acquisitions should they occur.

Diluted earnings per share, including the anticipated effect of our recent acquisitions, but excluding the effect of any future acquisitions, if they occur, are expected to be in the range of $3.00 to $3.10 (after adding back for one-time expenses related to the acquisition of TLC Health Care Services, Inc. ("TLC")), based on an estimated 26.9 million shares outstanding. Previous guidance released by the Company on April 30, 2008 anticipated 2008 revenue to be $1.05 billion to $1.10 billion and diluted earnings per share to be $2.70 to $2.80.

"Our integration of TLC is ahead of schedule, our revenue per episode is increasing and the roll out of our clinical programs is progressing very well. All of these factors have led us to increase 2008 revenue and earnings per share guidance" stated William F. Borne, Chief Executive Officer of Amedisys, Inc.

27. On July 29, 2008, Amedisys issued a press release announcing its financial results for the quarter ended June 30, 2008 ("July 29, 2008 Press Release"), which stated, in part, the following:

**AMEDISYS REPORTS RECORD SECOND QUARTER REVENUE AND NET INCOME**

**AMEDISYS TO HOST CONFERENCE CALL**
**TODAY AT 10:00 A.M. ET**

BATON ROUGE, Louisiana (July 29, 2008) — Amedisys, Inc. (NASDAQ: "AMED", "Amedisys" or "the Company"), one of America's leading home health nursing companies, today reported its financial results for the three-month period ended June 30, 2008. We posted record financial performance for the three-month period ended June 30, 2008 with net service revenue and net income increasing 84.5% and 36.6%, respectively, over the three-month period ended June 30, 2007. Following are highlights of our performance for the three and six-month periods ended June 30, 2008:
Three-Month Periods Ended June 30, 2008 and 2007

• Net service revenue increased 84.5% to $312.7 million compared to $169.5 million in 2007.
• Net income increased 36.6% to $20.4 million compared to $14.9 million in 2007.
• Diluted earnings per share increased 33.3% to $0.76 compared to $0.57 per diluted share in 2007. The weighted average number of diluted shares outstanding increased to approximately 26.8 million compared to 26.2 million in 2007.
• Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 68.7% to $44.3 million compared to $26.3 million in 2007 . . . .

"We are very happy with our second quarter results," stated William F. Borne, Chief Executive Officer of Amedisys. "The TLC acquisition was a strategic decision for our organization, expanding our coverage nationally during this time of payment reform. The integration of TLC is ahead of schedule and our new Specialty Division is progressing as projected.

28. Also on July 29, 2008, Amedisys filed its quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2008 (the "Q2 2008 10-Q"). The Q2 2008 10-Q, signed by defendant Redman, repeated the Company's financial results set forth in the July 29, 2008 Press Release. The Q2 2008 10-Q included SOX certifications signed by Borne and Redman that were substantially similar to the certifications alleged in ¶24.

29.     Further, the Q2 2008 10-Q made statements about the Company's home health services substantially similar to the statements alleged in ¶25.

30.     On October 28, 2008, Amedisys issued a press release announcing its financial results for the quarter ended September 30, 2008 ("October 28, 2008 Press Release"), which stated, in part, the following:

> AMEDISYS REPORTS RECORD THIRD QUARTER REVENUE AND NET INCOME
> *UPDATES 2008 REVENUE AND EPS GUIDANCE*
> AMEDISYS TO HOST CONFERENCE CALL
> TODAY AT 10:00 A.M. ET
>
> BATON ROUGE, Louisiana (October 28, 2008) — Amedisys, Inc. (NASDAQ: AMED) ("Amedisys," "we," "us," or "our"), one of America's leading home health nursing companies, today reported its financial results for the three-month period ended September 30, 2008. We posted record financial performance for the three-month period ended September 30, 2008 with net service revenue and net income increasing 77.7% and 16.2%, respectively, over the three-month period ended September 30, 2007. Following are highlights of our performance for the three and nine-month periods ended September 30, 2008:
> Three-Month Periods Ended September 30, 2008 and 2007
>
> • Net service revenue increased 77.7% to $321.6 million compared to $180.9 million in 2007.
> • Net income increased 16.2% to $23.5 million compared to $20.2 million in 2007.
> • Diluted earnings per share increased 13.0% to $0.87 compared to $0.77 per diluted share in 2007. The weighted average number of diluted shares outstanding increased to approximately 27.0 million compared to 26.3 million in 2007.
> • Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 46.4% to $49.4 million compared to $33.7 million in 2007 . . . .
>
> "This has been another exceptional quarter and nine-months with record revenue and earnings per share. All TLC agencies have been converted and are now operating on our corporate operating systems including the Point of Care network," stated William F. Borne, Chief Executive Officer of Amedisys.
>
> Updated 2008 Guidance

• Net service revenue is anticipated to be in the range of $1.150 billion to $1.175 billion, excluding the effects of future acquisitions, if they are made.

• Diluted earnings per share are expected to be in the range of $3.20 to $3.25 based on an estimated 26.9 million shares outstanding, after adding back any TLC integration costs and also excluding the effects of future acquisitions, if they are made.

31.     Also on October 28, 2008, Amedisys filed its quarterly report with the SEC on Form 10-Q for the quarter ended September 30, 2008 (the "Q3 2008 10-Q"). The Q3 2008 10-Q, signed by defendant Redman, repeated the Company's financial results set forth in the October 28, 2008 Press Release.  The Q3 2008 10-Q included SOX certifications signed by Borne and Redman that were substantially similar to the certifications alleged in ¶24.

32.     The Q3 2008 10-Q made statements about the Company's home health services substantially similar to the statements alleged in ¶25.

33.     On January 6, 2009, Amedisys issued a press release that stated, in part, the following:

AMEDISYS ISSUES 2009 GUIDANCE AND NAMES LARRY GRAHAM AS A NEW DIRECTOR

BATON ROUGE, Louisiana (January 6, 2009)—Amedisys, Inc. (Nasdaq: "AMED", "we", "our", "company"), one of America's leading home health nursing companies, today announced revenue and earnings per share guidance for 2009. Net service revenue in 2009 is anticipated to be in the range of $1.425 billion to $1.475 billion, excluding the effects of future acquisitions, if they are made. Diluted earnings per share in 2009 is expected to be in the range of $4.10 to $4.30 based on an estimated 27.5 million shares outstanding, also excluding the effects of future acquisitions, if they are made.

"Our 2009 guidance is driven by expected improvements in contributions from past acquisitions, our efficiency initiatives and organic revenue growth, including further contributions from our Specialty Division," stated William F. Borne, Chairman and Chief Executive Officer of

Amedisys, Inc. "We will continue to pursue our strategy of growing revenue through organic revenue growth, startups and acquisitions while providing efficient high quality health care."

34.    On February 17, 2009, Amedisys issued a press release announcing its

financial results for the quarter and year ended December 31, 2008 ("February 17, 2008

Press Release"), which stated, in part, the following:

AMEDISYS REPORTS RECORD FOURTH QUARTER REVENUE
AND NET INCOME
AMEDISYS TO HOST CONFERENCE CALL
TODAY AT 10:00 A.M. ET

BATON ROUGE, Louisiana (February 17, 2009) — Amedisys, Inc. (NASDAQ: AMED), one of America's leading home health nursing companies, today reported its financial results for the fourth quarter and the year ended December 31, 2008. We posted record financial performance for the fourth quarter with net service revenue and net income increasing 75.3% and 57.6%, respectively, over the fourth quarter of 2007. Following are highlights of our performance for the fourth quarter and the full-year: . . . .

Years Ended December 31, 2008 and 2007
• Net service revenue increased 70.1% to $1,187.4 million compared to $697.9 million in 2007.
• Net income increased 33.1% to $86.7 million compared to $65.1 million in 2007.
• Diluted earnings per share increased 29.8% to $3.22 compared to $2.48 per diluted share in 2007. The weighted average number of diluted shares outstanding increased to approximately 26.9 million compared to 26.3 million in 2007.
• EBITDA increased 55.6% to $177.4 million compared to $114.0 million in 2007.

"Today we are reporting outstanding results, with record revenue and earnings for both the fourth quarter and full year," said William F. Borne, CEO. "This marks the sixth consecutive year that earnings per share growth has exceeded 20%. Additionally, during the past year we have positioned the company well to continue our strong financial performance through completing the largest acquisition in our company's history, continuing our start-up strategy, introducing our Specialty Division and strengthening our balance sheet through significant debt repayment. We will continue to focus on our three pronged business strategy that has been the foundation of this success namely: providing superior clinical services,

17

growing the business aggressively and becoming as operationally efficient as possible."

35. Also on February 17, 2009, Amedisys filed its annual report with the SEC on Form 10-K for the year ended December 31, 2008 (the "2008 Annual Report"). The 2008 Annual Report, signed by defendants Borne and Redman, repeated the Company's financial results set forth in the February 17, 2009 Press Release. The 2008 Annual Report included SOX certifications signed by Borne and Redman that were substantially similar to the certifications alleged in ¶24.

36. The 2008 Annual Report included statements about the Company's home health services substantially similar to the statements alleged in ¶25 and included the following statements:

Controls over Our Business System Infrastructure

We establish and maintain processes and controls over coding, clinical operations, billing, compliance and patient recertifications to help ensure that we are compliant with Medicare requirements . . . .

*Billing*

We maintain comprehensive controls over our billing processes to help ensure accurate and complete billing. We have company-wide annual billing compliance testing; use formalized billing attestations; limit access to billing systems; use risk forecasting methodologies; perform direct line supervisor audits; hold weekly operational meetings; use automated daily billing operational indicators; deploy operational "turnaround teams" when problems are identified; and terminate employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized "Zero Tolerance Policy".

*Patient Recertification*

In order to be recertified for an additional episode of care, a patient must be diagnosed with a continuing medical need. This could take the form of a continuing skilled clinical need or could be caused by changes to the patient's medical regimen or by modified care protocols within the episode of care. As with the initial episode of care, a recertification

requires approval of the patient's physician. Before any employee recommends recertification to a physician, we conduct an agency level, multidisciplinary care conference. We also use centralized automated compliance recertification indicators to identify and monitor agencies that have relatively high recertification levels.

*Compliance*

The quality and reputation of our personnel and operations are critical to our success. We develop, implement and maintain comprehensive ethics, compliance and quality improvement programs as a component of the centralized corporate services provided to our home health and hospice agencies. Our ethics and compliance program is administered by our Chief Compliance Officer, a former state prosecutor, and includes a Code of Ethical Business Conduct for our employees, officers, directors and affiliates and a process for reporting regulatory or ethical concerns to our Chief Compliance Officer through a confidential hotline. We promote a culture of compliance within our company through persistent messages from our senior leadership concerning the necessity of strict compliance with legal requirements and company policies and procedures, and through publicizing and enforcing our Zero Tolerance Policy. We also employ a comprehensive compliance training program that includes: annual compliance testing; new hire compliance training; new acquisition compliance training; sales compliance training; new employee orientation—compliance education; billing compliance training; and compliance presentations at all company functions, Our executive compliance committee includes our Chief Executive Officer, Chief Operating Officer and President, Chief Financial Officer, Chief Information Officer and Senior Vice President of Clinical Operations, Chief Compliance Officer, Senior Vice President of Human Resources and Senior Vice President of Internal Audit, and meets on a quarterly basis to establish the agenda for compliance initiatives and review the status of compliance initiatives and audits, as well as the operations of our Compliance Department.

37.    On April 28, 2009, Amedisys issued a press release announcing its financial results for the quarter ended March 31, 2009 ("April 28, 2009 Press Release"), which stated, in part, the following:

AMEDISYS REPORTS RECORD FIRST QUARTER REVENUE AND EARNINGS, REDUCES DAYS REVENUE OUTSTANDING, AND CONFIRMS 2009 GUIDANCE AMEDISYS TO HOST CONFERENCE CALL

TODAY AT 10:00 A.M. ET

BATON ROUGE, Louisiana (April 28, 2009) — Amedisys, Inc. (NASDAQ: AMED), one of America's leading home health nursing companies, today reported its financial results for the three-month period ended March 31, 2009. We posted record financial performance with net service revenue and net income attributable to Amedisys, Inc., increasing 60.4% and 64.1%, respectively over the three-month period ended March 31, 2008.

Three-Month Periods Ended March 31, 2009 and 2008

• Net service revenue increased $128.7 million or 60.4% to $341.8 million compared to $213.1 million in 2008, with $82.7 million of the increase related to growth through our acquisitions.
• Net income attributable to Amedisys, Inc. increased $10.5 million or 64.1% to $27.0 million compared to $16.5 million in 2008
• Diluted earnings per share increased 59.7% to $0.99 compared to $0.62 per diluted share in 2008. The weighted average number of diluted shares outstanding increased to approximately 27.3 million compared to 26.6 million in 2008.
• Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 67.0% to $54.0 million compared to $32.3 million in 2008.

38.     Also on April 28, 2009, Amedisys filed its quarterly report with the SEC on Form 10-Q for the quarter ended March 31, 2009 (the "Q1 2009 10-Q"). The Q1 2009 10-Q, signed by defendant Redman, repeated the Company's financial results set forth in the April 28, 2009 Press Release.  The Q1 2009 10-Q included SOX certifications signed by Borne and Redman that were substantially similar to the certifications alleged in ¶24.

39.     The Q1 2009 10-Q made statements about the Company's home health services substantially similar to the statements alleged in ¶25.

40.     On July 28, 2009, Amedisys issued a press release announcing its financial results for the quarter ended June 30, 2009 ("July 28, 2009 Press Release"), which stated, in part, the following:

AMEDISYS REPORTS SECOND QUARTER REVENUE AND EARNINGS

AMEDISYS TO HOST CONFERENCE CALL
TODAY AT 10:00 A.M. ET

BATON ROUGE, Louisiana (July 28, 2009) — Amedisys, Inc. (NASDAQ: AMED), one of America's leading home health nursing companies, today reported its financial results for the three and six-month periods ended June 30, 2009. We posted record financial performance with net service revenue and net income attributable to Amedisys, Inc., increasing 20.9% and 72.1%, respectively over the three-month period ended June 30, 2008.

Three-Month Periods Ended June 30, 2009 and 2008

• Net service revenue increased $65.2 million or 20.9% to $377.9 million compared to $312.7 million in 2008, with $54.0 million of the increase related to growth through base/start-up agencies.
• Net income attributable to Amedisys, Inc. increased $14.7 million or 72.1% to $35.1 million compared to $20.4 million in 2008
• Diluted earnings per share increased 67.1% to $1.27 compared to $0.76 per diluted share in 2008. The weighted average number of diluted shares outstanding increased to approximately 27.5 million compared to 26.8 million in 2008.
• Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 52.0% to $67.4 million compared to $44.3 million in 2008 . . . .

Updated 2009 Guidance
• Net service revenue is anticipated to be in the range of $1.475 billion to $1.500 billion, excluding the effects of future acquisitions, if any are made.
• Diluted earnings per share is expected to be in the range of $4.75 to $4.90 based on an estimated 27.8 million shares outstanding, also excluding the effects of future acquisitions, if any are made.

41.     Also on July 28, 2009, Amedisys filed its quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2009 (the "Q2 2009 10-Q"). The Q2 2009 10-Q, signed by defendant Redman, repeated the Company's financial results set forth in the July 28, 2009 Press Release.  The Q2 2009 10-Q included SOX certifications signed by Borne and Redman that were substantially similar to the certifications alleged in ¶24.

42.     The Q2 2009 10-Q made statements about the Company's home health services substantially similar to the statements alleged in ¶25.

43.     On October 27, 2009, Amedisys issued a press release announcing its financial results for the quarter ended September 30, 2009 ("October 27, 2009 Press Release"), which stated, in part, the following:

**AMEDISYS REPORTS THIRD QUARTER REVENUE AND
EARNINGS AND REAFFIRMS 2009 GUIDANCE
AMEDISYS TO HOST CONFERENCE CALL
TODAY AT 10:00 A.M. ET**

BATON ROUGE, Louisiana (October 27, 2009) — Amedisys, Inc. (NASDAQ: AMED), one of America's leading home health nursing companies, today reported its financial results for the three and nine-month periods ended September 30, 2009. We posted record financial performance with net service revenue and net income attributable to Amedisys, Inc., increasing 20.7% and 53.0%, respectively, over the three-month period ended September 30, 2008.

Three-Month Periods Ended September 30, 2009 and 2008

• Net service revenue increased $66.7 million or 20.7% to $388.3 million compared to $321.6 million in 2008, with $53.2 million of the increase related to growth through base/start-up agencies.
• Net income attributable to Amedisys, Inc. increased $12.4 million or 53.0% to $35.9 million compared to $23.5 million in 2008
• Diluted earnings per share increased 48.3% to $1.29 compared to $0.87 per diluted share in 2008. The weighted average number of diluted shares outstanding increased to approximately 27.9 million compared to 27.0 million in 2008.
• Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 40.0% to $69.1 million compared to $49.4 million in 2008 . . . .

2009 Guidance

• Net service revenue is anticipated to be in the range of $1.475 billion to $1.500 billion, excluding the effects of future acquisitions, if any are made.

• Diluted earnings per share is expected to be in the range of $4.75 to $4.90 based on an estimated 27.8 million shares outstanding, also excluding the effects of future acquisitions, if any are made.

44.     Also on October 27, 2009, Amedisys filed its quarterly report with the SEC on Form 10-Q for the quarter ended September 30, 2009 (the "Q3 2009 10-Q"). The Q3 2009 10-Q, signed by defendant Redman, repeated the Company's financial results set forth in the October 27, 2009 Press Release.  The Q3 2009 10-Q included SOX certifications signed by Borne and Redman that were substantially similar to the certifications alleged in ¶24.

45.     On February 23, 2010, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2009 (the "February 23, 2010 Press Release").  The Company reported net service revenue of $405.5 million compared to $340.1 million in the fourth quarter of 2008.  The Company further reported net income of $37.8 million, or $0.135 diluted earnings per share for the quarter, compared to $26.3 million, or $0.97 diluted earnings per share in the same period of the prior year.  For the year, the Company reported net service revenue of $1.5 billion, compared to $1.2 billion in 2008.  The Company further reported net income of $135.8 million for 2009, compared to $86.7 million in 2008.

46.     Also on February 23, 2010, the Company filed its annual report for the fourth quarter and year ended December 31, 2009 with the SEC on Form 10-K ("2009 Annual Report") which was signed by defendants Borne and Redman.  The Form 10-K repeated the financial results set forth in the February 23, 2010 Press Release. The 2009 Annual Report included SOX certifications signed by Borne and Redman that were substantially similar to the certifications alleged in ¶24.

47.     In addition, the 2009 Annual Report stated the following:

Medicare Participation

As we expect to continue to receive the majority of our revenue from serving Medicare beneficiaries, our agencies must comply with regulations promulgated by the United States Department of Health and Human Services in order to participate in the Medicare program and receive Medicare payments. Among other things, these regulations, known as "conditions of participation," relate to the type of facility, its personnel and its standards of medical care, as well as its compliance with state and local laws and regulations.

\*      \*      \*

Controls over Our Business System Infrastructure
We establish and maintain processes and controls over coding, clinical operations, billing, patient recertifications and compliance to help monitor and promote compliance with Medicare requirements.

\*      \*      \*

- *Billing* – We maintain controls over our billing processes to help promote accurate and complete billing. In order to promote the accuracy and completeness of our billing, we have annual billing compliance testing; use formalized billing attestations; limit access to billing systems; use risk forecasting methodologies; perform direct line supervisor audits; hold weekly operational meetings; use automated daily billing operational indicators; and take prompt corrective action with employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized "Zero Tolerance Policy."

- *Patient Recertification* – In order to be recertified for an additional episode of care, a patient must be diagnosed with a continuing medical need. This could take the form of a continuing skilled clinical need or could be caused by changes to the patient's medical regimen or by modified care protocols within the episode of care. As with the initial episode of care, a recertification requires approval of the patient's physician. Before any employee recommends recertification to a physician, we conduct an agency level, multidisciplinary care team conference. We also monitor centralized automated compliance recertification metrics to identify, monitor, and where appropriate audit, agencies that have relatively high recertification levels.

- *Compliance* – The quality and reputation of our personnel and operations are critical to our success. We develop, implement and maintain ethics, compliance and quality improvement programs as a component of the centralized corporate services provided to our home health and hospice agencies. Our ethics and compliance program includes a Code of Ethical Business Conduct for our employees, officers, directors

and affiliates and a process for reporting regulatory or ethical concerns to our Chief Compliance Officer through a confidential hotline. We promote a culture of compliance within our company through persistent messages from our senior leadership concerning the necessity of strict compliance with legal requirements and company policies and procedures, and through publicizing and enforcing our Zero Tolerance Policy. We also employ a comprehensive compliance training program that includes: annual compliance testing; new hire compliance training; new acquisition compliance training; sales compliance training; new employee orientation compliance training; billing compliance training; and compliance presentations at all company functions.

48. The statements referenced above in ¶¶23-47 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them: (1) that the Company improperly increased the number of in-home therapy visits to patients for the purpose of triggering higher reimbursement rates under the Medicare home health prospective payment system; (2) as a result of the Company's improper conduct, its reported sales and earnings were materially inflated; (3) and based on the foregoing, defendants lacked a basis for their positive statements about the Company, its prospects and growth.

## VI.   THE TRUTH BEGINS TO EMERGE

49. On April 26, 2010, as alleged in ¶6, the WSJ published an article questioning whether Amedisys was improperly taking advantage of the Medicare reimbursement system by increasing the number of in-home therapy visits.

50. As a result of the revelations by the article in the WSJ, Amedisys common stock declined $3.98 per share or 6.5%.

51. Following the WSJ article, the Senate Finance Committee started an investigation of Amedisys's billing and operating practices. In a letter to Amedisys dated

May 12, 2010, the Committee cited to the article and questioned whether Amedisys "intentionally increased utilization for the purpose of triggering higher reimbursements."

52.     The next day, the WSJ reported that the Committee had launched an investigation into the practices of Amedisys and whether the Company has "deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements." The article stated, in part, the following:

> Companies "working with Medicare should not be allowed to target seniors or manipulate care simply to get higher reimbursement rates," said Sen. Max Baucus (D., Mont.), chairman of the finance committee, in a statement.
>
> "It appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both," said Sen. Charles Grassley (R., Iowa), ranking member of the committee. "We're working to figure out what's going on."
>
> \*       \*       \*
>
> The senators asked Amedisys to also provide information on its falls-prevention program called "Balanced for Life."
>
> More than 330 Amedisys locations offer "Balanced for Life" – for which Amedisys has told investors that it receives an extra $1,000 to $2,000 per patient – up from 33 locations in 2008.

53.     On May 13, 2010, the price of Amedisys' common stock declined approximately 8% or $4.48 per share to close at $51.73 per share.

54.     Then, on June 30, 2010, after the close of trading, Amedisys issued a press release that disclosed the Company was under formal investigation by the SEC.

55.     On July 1, 2010, the price of Amedisys shares declined from a close on June 30, 2010 of $43.98 per share to close at $39.34 per share, a decline of $4.64 per share or approximately 11% on higher than usual volume.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

56. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Amedisys stock price and operated as a fraud or deceit on Class Period purchasers of Amedisys stock by misrepresenting the Company's operating condition and future business prospects. Defendants achieved this by making positive statements about Amedisys's business and projecting strong earnings for the Company while they knew that the Company was suffering from a variety of adverse factors which were then negatively impacting its financial results, as detailed herein. Later, however, when defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Amedisys stock fell precipitously as the prior artificial inflation came out of Amedisys' stock price. As a result of their purchases of Amedisys stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

57. As a direct result of the public revelations regarding the truth about the condition of Amedisys' business and the negative adverse factors that had been impacting Amedisys's business during the Class Period, the price of Amedisys' stock materially declined. This drop removed the inflation from Amedisys's stock price, causing real economic loss to investors who purchased the stock during the Class Period.

58. The decline in Amedisys's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Amedisys' stock price declines negate any inference that the loss suffered by plaintiff and other Class members was

caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.

## IX.    FRAUD-ON-THE-MARKET DOCTRINE

59.    At all relevant times, the market for Amedisys common stock was an efficient market for the following reasons, among others:

(a)    The Company's common stock met the requirements for public listing and was listed and actively traded on the Nasdaq, a highly efficient market;

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC; and

(c)    The Company regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

60.    As a result, the market for the Company's publicly traded common stock promptly digested current information with respect to Amedisys from all publicly available sources and reflected such information in the price of the Company's common stock.  Under these circumstances, all purchasers of the Company's publicly traded common stock during the Class Period suffered similar injury through their purchase of the publicly traded common stock of Amedisys at artificially inflated prices and a presumption of reliance applies.

## X.    ADDITIONAL SCIENTER ALLEGATIONS

61.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issues or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents

would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Amedisys, their control over, and/or receipt and/or modification of Amedisys' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Amedisys, participated in the fraudulent scheme alleged herein.

62.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of Amedisys, issued statements and press releases on behalf of Amedisys and had the opportunity to commit the fraud alleged herein.

## XI.     NO SAFE HARBOR

63.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking

statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Amedisys who knew that those statements were false when made.

### FIRST CLAIM FOR RELIEF
**For Violation of Section 10(b) of the 1934 Act
and Rule 10b-5 Against All Defendants**

64. Plaintiff incorporates ¶¶1-63 by reference.

65. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66. Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

30

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Amedisys publicly traded common stock during the Class Period.

67.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Amedisys's publicly traded common stock.  Plaintiff and the Class would not have purchased Amedisys common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

68.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Amedisys common stock during the Class Period.

**SECOND CLAIM FOR RELIEF**
**For Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants**

69.     Plaintiff incorporates ¶¶1-63 by reference.

70.     The Individual Defendants acted as a controlling person of Amedisys within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to

copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

72.    As set forth above, Amedisys and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Amedisys's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 14, 2010        NEBLETT, BEARD & ARSENAULT


/s/ C. Michael Bollinger

Richard J. Arsenault, LA Bar #2563
C. Michael Bollinger, LA Bar #01259
2220 Bonaventure Court
P.O. Box 1190
Alexandria, LA 71301-1190
Tel: (318) 487-9874
Fax: (318) 561-2591

*-and-*

KAPLAN FOX & KILSHEIMER LLP
Joel B. Strauss
Jeffrey P. Campisi
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

*Attorneys for Plaintiff*